IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
TYLER DIVISION

TERRY D. GRAY, SR.                    §

VS.                                   §            CIVIL ACTION NO. 6:22cv071

LT. BRIAN GRAHAM, et al.              §

REPORT AND RECOMMENDATION OF THE
UNITED STATES MAGISTRATE JUDGE

Plaintiff Terry D. Gray, Sr., an inmate currently incarcerated in Rusk County, Texas, proceeding *pro se* and *in forma pauperis*, filed this civil rights lawsuit complaining of alleged violations of his constitutional rights occurring while traveling by vehicle in Henderson, Texas. The case was referred to the undersigned United States Magistrate Judge for findings of fact, conclusions of law, and recommendations for the disposition of the case.

Gray is suing (1) Officer Keaton Hand, (2) Lt. Brian Graham, (3) Deputy Chief Randal Hudman, (4) Craig Sweeney, and (5) the City of Henderson, Texas. Pending before the Court is Defendants' motion for summary judgment, (Dkt. #31), Gray's response in opposition, (Dkt. #59), and Defendants' reply, (Dkt. #60). For reasons explained below, the Court recommends that Defendants' motion for summary judgment, (Dkt. #31), be granted and that Plaintiff Gray's lawsuit be dismissed with prejudice.

**I. Gray's Claims—Amended Complaint**

The operative pleading in this lawsuit is Gray's amended complaint, (Dkt. #36). An amended complaint entirely supersedes and takes the place of the original complaint. *See Clark v. Tarrant Cnty., Tex.*, 798 F.2d 736 (5th Cir. 1986). Gray maintains that on October 13, 2020, while traveling through Henderson, Texas, on the way to Arkansas, at approximately 2:00 AM, he arrived at a curve and noticed a patrol car. After exiting the curve, Defendant Hand "got behind

1

[him] reading [his] out of state tags and activated his lights," (Dkt. #36, pg. id. #242). Gray states he then pulled over and Defendant Hand approached his vehicle, asked for his license and insurance, and informed him that he was traveling 70 MPH in a 40 MPH zone—which Gray denies. Gray contends that a speeding citation should have been given and that he be "free to leave," but that he was not given a ticket. *Id.*

He also contends that Defendant Hand "wanted to search [his] car" and told him that he "looked suspicious." *Id.* At that point, he requested that Hand call his supervisor because he was "racially profiling" and has no consent to search. Officer Graham arrived as backup, and Gray states both officers then searched his vehicle under the hood, and began removing items form the vehicle—including a "beer bottle case that has been in his car a week"—and looking for drugs and guns. Gray insists that nothing illegal was discovered in the search and that he was never shown a warrant.

Defendant Hand then asked Gray whether had had been drinking to which Gray responded "yes." Gray asserts that he "clearly stated the night before" he left College Station before bed. He insists that Hand never articulated that he smelled alcohol during the stop, but Officer Graham placed him in handcuffs stated, "well you refused to take a field test," (Dkt. #36, pg. id. #244). Gray states that he did not refuse the test. He was eventually uncuffed and permitted to take the field test—but he complains that he was nervous throughout. Defendant Hand and Officer Graham never administered a breathalyzer test, and Gray notes that he continued to remark to both officers that they were racially profiling because he is "black with out of state plates." *Id.*

He also stresses that he did not given consent for the hospital to draw his blood because Hand "refused to give [him] a breathalyzer" test. Gray explains that he was arrested, given a bond,

and released the following day. He was never charged with a crime in connection with this stop and arrest.

## II. Defendants' Motion for Summary Judgment

Defendants maintain, (Dkt. #31), that there are no genuine issues of material fact. Specifically, they argue that both the initial stop of Gray and subsequent search of his vehicle were predicated on probable cause and are therefore constitutional. They also contend that Gray's claim of false arrest is without merit—and that there is no evidence of racial profiling. Finally, they insist that Gray's claim concerning the alleged failure to train is meritless and that they are entitled to qualified immunity.

## III. Summary Judgment Evidence

Defendants attached several exhibits in support of their motion:

**Exhibit A:**    **Henderson Police Department Incident Report, #202008263,**

**Exhibit B:**    **Affidavit of Keaton Hand,**

**Exhibit C:**    **Affidavit of Brian Graham**

**Exhibit D:**    **Affidavit of Randall Hudman (and attached policy),**

**Exhibit E:**    **Copy of Video from Defendant Hand's bodycam,**

**Exhibit F:**    **Copy of video from Defendant Graham's bodycam,**

**Exhibit G:**    **Copy of video from Defendant Graham's dashcam,**

**Exhibit H:**    **Application for search warrant for blood sample,**

**Exhibit I:**    **Search warrant for blood draw, and**

**Exhibit J:**    **Gray's blood test results.**

(Dkt. #31). Attached to his amended complaint, Gray provides documents regarding the Henderson County Sheriff's Department professional standards and its core values—and Officer Graham's affidavit, (Dkt. #31-3).

<u>1. Incident Report</u>

According to the incident report, which contains a narrative written by Defendant Hand, Gray's arrest stemmed from a traffic stop. Specifically, on November 13, 2020, Hand was "running mobile radar" when he observed a vehicle—a "green Buick passenger car"—bearing an Arkansas license plate traveling 70 miles per hour (mph) in a 40-mph zone, (Dkt. #31, pg. 30). Hand proceeded to follow the vehicle, activating his overhead lights. Upon making contact with the driver, Gray, he attempted to explain the reason for the traffic stop, "but he continuously cut me off stating he was looking at his GPS trying to get home." Hand was finally able to explain the reason for the stop, at which point he requested Gray's license and insurance. He observed Gray "struggling with the simple task of removing the license from his wallet," and asked him if he was "okay"—to which Gray replied that he was nervous because his wife was "talking crazy." *Id.*

Hand further noted that he observed Gray "struggle to remove his insurance from the glove compartment," and identified him upon receiving the identification. Because of Gray's nervous behavior, Hand explains, he "asked him [to] exit the vehicle so I could issue him a warning for the traffic violation." Gray, before exiting the vehicle, remarked that Hand "could check his car because he didn't have anything in it," (Dkt. #31, pg. 31).

Upon his exit from the vehicle, Hand explains that he "noticed [Gray] was using his car to keep himself balanced as he walked to the rear of the vehicle." *Id.* Hand further states that as he began to write Gray's traffic warning, he "noticed he was still nervous and continued to inform me to search his car because he didn't have anything in it." *Id.* Gray "was using his car to keep

himself balanced as he walked to the rear of the vehicle," and still appeared nervous. Hand began asking him questions, and he "noticed a slur to his speech and that he would get easily sidetracked"—as well ss "an odor of an alcohol beverage emitting from his breath and his eyes to be red and glossy," (Dkt. #31, pg. 31). Gray explained that he was still extremely nervous around police "due to him being on parole for a previous DWI charge." *Id*.

Based on Gray's nervousness, Hand asserts, he asked for verbal consent to search his vehicle—to which Gray consented. *Id*. K9 Officer Bisnette arrived on the scene to assist, and Hand conducted a search. He explains that he discovered "one cold to the touch open Budweiser beer bottle under the front center seat along with an unopened Budweiser can with condensation on it," to which Gray "admitted to me that he had been drinking the open Budweiser beer." *Id*. Once Hand finished his search, he states that he informed Gray that he would be conducting a Standardized Field Sobriety Test (SFSTDs) "to determine if he was fit to operate a motor vehicle." *Id*. At this point, Gray "began to accuse officers of racial profiling him and looking for a reason to put him in jail and demanded to speak to a supervisor." *Id*. Lieutenant Graham then arrived on the scene and spoke to Gray; Hand contends that "Mr. Gray then attempted to stall for time by arguing with Lt. Graham and other officers." *Id*.

Hand then relocated to a different area to conduct the sobriety test. According to Hand, "Gray then began to put on a show by stumbling around with his arms spread out while accusing officers to be looking for an excuse to arrest him." *Id*. Ultimately, Gray "became irate and refused to cooperate with the test—(1) beginning to walk before instruction to do so, and (2) using his arms to balance, all of which Hand characterizes as "clues." *Id*. at pg. 2. Gray then informed Hand that he had a "heart attack and his nervous system was messed up so he could not take the test"— at which point Hand detained him via handcuffs and placing him in the back of a patrol car.

Gray eventually calmed down and proceeded to take the sobriety test. According to Hand, Gray could not stay balanced and started before instructions to do so. He "missed heel to toe," stepped off the line, stopped while walking, used his arms to balance, made an improper turn, and began walking backwards. *Id.* at pg. 32. Based on Gray's performance, Hand "placed him into custody for Driving While Intoxicated and placed him in handcuffs and back into the patrol car. Hand then read him his *Miranda* warnings. Gray refused a blood draw, and Hand obtained a search warrant for the blood draw—which subsequently revealed Gray's blood alcohol level of 0.147 grams per 100 milliliters, indicating that he was driving while intoxicated, (Dkt. #31, pg. 45; 77).

### 2. Video Footage—Defendant Hand's Bodycam

Defendants provide the video footage of Defendant Hand's execution of Gray's arrest. The Court viewed the video in its entirety, and the contents mirror Hand's affidavit. The video shows Hand approaching Gray, who was in the driver's seat of a stopped vehicle, and Gray then rolls down the driver's side window. Hand immediately states that he is "looking at his GPS" and heading home to Arkansas. Hand explains that he stopped him because of "his speed," to which Gray states "yeah, I got insurance" and he begins looking at GPS on his cellphone. Gray states that he is trying to go home. Hand asks for his driver's license, to which Gray responds in the affirmative and begins to reach into his back left pocket for his wallet. After he grabs his wallet, the video depicts him unsuccessfully attempting—struggling—to remove the license from the wallet, while Gray articulates "oh my goodness" several times.

The video illustrates that Gray eventually retrieving his license from inside the wallet, as he remarks that he is "nervous" because his wife is talking "crazy" and "they were going through some stuff." Gray proceeds to reach for the passenger's side and struggles to look for a document, explaining that he and his wife were "going through stuff." Gray repeats "goodness" and

yells/screams "ugh" while still searching for his registration. The video depicts him attempting remove what appears to be a manilla envelope from the glove compartment—while still struggling to get it out of the compartment. Once he grabs the envelope, Gray tells Hand that he is travelling from Bryan, Texas, and pulls out all the paper contents inside the envelope.

Hand then explains that he is going to write him a warning, but that Gray needed to step outside the vehicle while he writes it. Gray immediately states that Hand "could check the car, I don't have nothing," to which Hand responds he was just going to write him a warning because Gray was "going through a lot" and he did not want to "hinder" him anymore. The video shows Gray exiting the vehicle, and they begin to walk towards the police car as Hand reiterates that he is just writing Gray a warning. Gray begins cussing and sits on the back of the vehicle—again remarking that he has nothing inside the vehicle. 3:17. Hand walks back to his police car and grabs his notepad, and Gray then loudly moans or groans. 3:26 Gray then again states that Hand can check his car, and Hand says he does not want to check it, "at least not right now anyway." 3.33. Gray says he "has nothing to hide," as Hand is inspecting Gray's license. 4.10. Hand begins asking Gray questions about who he was visiting in Bryan as he is writing the warning.

Hand explains that he is trying to calm him down because he seems nervous, to which Gray responds that he is nervous because he is on parole for DWI (Driving while Intoxicated). 5.17. He continues to articulate that he has nothing to hide and that Hand can check his car—and that he is "[expletive] up for real" because of his wife. Hand calls for backup and asks Gray if there is anything illegal in the vehicle—and Gray articulates "nothing nothing." 9.40. Gray "promises" that he has nothing—and Hand mentions that his "story is all over the place" and that he is "real nervous." 10.34. Another officer arrives, and Hand asks Gray if he can search the vehicle because

Gray is "real nervous." Gray then gives Hand permission to search, telling him "please" and to specifically "tear it up." 10:48-49.

Gray again says "check my car, and "you have my consent to check everything in my car." 11:37. Hand begins searching the vehicle, discovering an open beer can on the passenger's side. 12:24. The video depicts the second officer remarking to Hand, "he really wants you to search his car." 14.12. Hand asks Gray if that is the only beer he drank this evening, to which Gray responds one beer.

Hand states that he needs to perform a few tests to make sure Gray is okay to drive. Gray reiterates he had one beer. Gray then begins arguing with Hand—remarking that he stopped him for no reason and denies that he was speeding. 29.01. Gray asked him why he searched his car and whether it was because "he is black," 29.04, to which Hand responds by explaining that he was traveling 70 MPH in a 40 MPH and "his behavior." 29:09. Gray then proceeds to state that Hand searched his car because he is black, to which Hand denies, and further Gray insists "he did this for no reason," and that he was "looking for something because he is black." Hand explains that he was acting nervous; Gray continues to remark that Hand can search his vehicle.

Moreover, the second officer speaks to Gray and explains that he was speeding but that it has nothing to do with skin color. He also explains that they searched his car, not because of race, but also because he consented to the search. Gray continues to explain that he believes this is a race issue as he is "spooked because he is black" and the officers are white. The officers then call the Lieutenant to the scene after Gray expresses that he "feels threatened." The Lieutenant Graham arrives to the scene—and listens to Gray articulate his story of the events. Hand continues to ask if he can perform the tests to make sure he can drive and Gray repeatedly states that he feels discriminated against.

Gray then attempts to perform the tests. As he attempts, Hand remarks that he can smell alcohol on his breath. Gray then states he had a heart attack and cannot walk because of his nervous system and medications. After refusing to take the test and cooperate, Hand begins to cuff Gray, and they escort him to the police vehicle. Gray then states he is going to "sue the [expletive] out of you."

The video depicts the Defendant Hand providing Gray with an additional opportunity to comply and take the tests. Hand then proceeds to uncuff him, and Gray takes the tests after articulating that he is panicking and taking medications; he maintains arguing with Hand and stating he is nervous. The video further depicts that at the end of the tests, Hand explains that based on the tests, he had probable cause to believe Gray was operating a motor vehicle and was intoxicated in public place. 1:03.11. Gray was placed under arrest for driving while intoxicated.

## IV. Standard of Review

A court shall grant summary judgment only where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to a judgment as a matter of law." Rule 56(c), Fed. R. Civ. P.  In determining whether there is a genuine dispute of a material fact, the court must examine the evidence and inferences drawn therefrom in the light most favorable to the nonmoving party.  *See S.E.C. v. Recile*, 10 F.3d 1093, 1097 (5th Cir. 1994). Summary judgment is appropriate "where critical evidence is so weak or tenuous on an essential fact that it could not support a judgment in favor of the nonmovant."  *Little v. Liquid Air. Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994) (internal citations omitted). "Material facts are those that might affect the outcome of the suit under the governing law." *Crostley v. Lamar Cnty., Tex.*, 717 F.3d 410, 422 (5th Cir. 2019) (internal citation and quotations omitted).

The Fifth Circuit has held that summary judgment disposition is inappropriate if the evidence before the court, viewed as a whole, could lead to different factual findings and conclusions. *See Honore v. Douglas*, 833 F.2d 565, 567 (5th Cir. 1987). It is not the function of the trial judge—in ruling on a motion for summary judgment—to weigh the evidence, assess credibility, or determine the most reasonable inference to be drawn from the evidence. *Id*. at 567 (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986)).

Crucially, here, the Fifth Circuit has held that when video evidence exists that "blatantly contradicts the plaintiff's allegations," the district court should not adopt the plaintiff's version of the facts—and should, instead, view the facts in the light depicted by the videotape. *See Hodge v. Engleman*, 90 F.4th 840, 845-46 (5th Cir. 2024) (citing *Livingston v. Texas*, No. 22-40719, 2023 WL 4931923, at *2 (5th Cir. Aug. 2, 2023) ("The video contradicted the plaintiff's claim of a 'genuine dispute that his constitutional rights had been violated," entitling the defendants to QI.")); *see also Craig v. Martin*, 49 F.4th 404, 409 (5th Cir. 2022) (reversing the denial of qualified immunity because the plaintiff's allegations were "blatantly" contradicted by the video evidence).

If the movant satisfies its initial burden of demonstrating the absence of a material fact dispute, then the non-movant must identify specific evidence in the summary judgment record demonstrating that there is a material fact dispute concerning the essential elements of its case for which it will bear the burden of proof at trial. *Douglass v. United Servs. Auto. Ass'n*, 79 F.3d 1415, 1429 (5th Cir. 1996). The non-movant cannot survive a motion for summary judgment by resting on the allegations in his pleadings. *Isquith v. Middle South Util., Inc.,* 847 F.2d 186, 199 (5th Cir.), *cert. denied*, 488 U.S. 926 (1988).

To carry this burden, the non-movant must submit competent summary judgment evidence sufficient to defeat a properly supported motion for summary judgment. *See, e.g., Burleson v. Tex.*

*Dep't of Criminal Justice*, 393 F.3d 577, 589-90 (5th Cir. 2004); *Domino v. Texas Dep't of Criminal Justice*, 239 F.3d 752, 755 (5th Cir. 2001). All reasonable inferences are drawn in favor of the non-moving party, but the non-moving party "cannot defeat summary judgment with conclusory allegations, unsubstantiated assertions, or only "a scintilla of evidence.'" *Hathaway v. Bazany*, 507 F.3d 312, 319 (5th Cir. 2007); *Miller v. Graham*, 447 F. App'x 549, 551 (5th Cir. 2011); *Chacon v. York*, 434 F. App'x 330, 332 (5th Cir. 2011). "Conclusory allegations and denials, speculation, improbable inferences, unsubstantiated assertions, and legalistic argumentation" will not survive summary judgment. *Orr v. Copeland*, 844 F.3d 484, 490 (5th Cir. 2016). Rather, the non-movant "must point to specific evidence in the record demonstrating a material fact issue" at the summary judgment stage. *See Mitchell v. Mills*, 895 F.3d 365, 270 (5th Cir. 2018). The non-movant cannot rest upon mere allegations or "denials of the adverse party's pleading." *See U.S. v. Lawrence*, 276 F.3d 193, 197 (5th Cir. 2001).

When qualified immunity is invoked, as is here, "only evidence—not argument, not facts in the complaint—will satisfy" the burden of proof necessary to defeat summary judgment. *See Johnston v. City of Houston*, 14 F.3d 1056, 1060 (5th Cir. 1994) (internal citation omitted). Once the movant asserts immunity, the burden then shifts to the plaintiff to rebut it with more than conclusory allegations, unsubstantiated assertions, or speculation. *See Cousin v. Small*, 325 F.3d 627, 637 (5th Cir. 2003); *see also Miller v. Graham*, 447 F. App'x 549, 551 (5th Cir. 2011) ("Miller has not overcome Graham's assertion of qualified immunity because he presented nothing but conclusory allegations and unsubstantiated assertions to assert his claim").

**V. Discussion and Analysis**

A review of the summary judgment evidence, viewed in the light most favorable to Gray, demonstrates that the evidence before the Court could not lead to different factual findings and conclusions. Summary judgment in favor of all Defendants is appropriate on Gray's claims.

<u>1. The Initial Traffic Stop</u>

Defendant Hand's traffic stop of Gray on November 14, 2020, in Henderson Texas, did not run afoul of the Constitution, as it was properly predicated on reasonable suspicion. This claim will be dismissed.

The Fourth Amendment of the United States Constitution protects individuals against warrantless searches and seizures, which includes a brief investigatory stop of a vehicle. *See United States v. Alkheqani*, 78 F.4th 707, 716 (5th Cir. 2023); U.S. Const. amend. IV. When an officer stops a vehicle, he "must have a particularized and objective basis for suspecting the particular person stopped of criminal activity"—i.e., reasonable suspicion. *Id.* (quoting *United States v. Cortez*, 449 U.S. 411, 417-18 (1981)). In other words, "reasonable suspicion exists when the officer can point to specific and articulable facts, which taken together with rational inferences from those facts, reasonably warrant the search and seizure." *Id.* (quoting *United States v. Broca-Martinez*, 855 F.3d 675, 678 (5th Cir. 2017)). An officer must have more than a "mere hunch" that the person stopped is engaged in criminal activity, but "reasonable suspicion does not need to rise to the level of probable cause." *See United States v. Lopez-Moreno*, 420 F.3d 420, 430 (5th Cir. 2005). Reasonable suspicion requires "only some minimal level of justification for making the stop." *See United States v. Castillo*, 804 F.3d 361, 364 (5th Cir. 2015).

Exceeding the speed limit is a violation of the Texas Transportation Code §§ 545.351(a), 545.352. Federal courts have repeatedly found that an officer has reasonable suspicion to conduct

a traffic stop after observing a vehicle speeding. *See, e.g.*, *United States v. Rodriguez*, 2013 WL 12099871, at *2 (S.D. Tex. Oct. 8, 2013) ("A police radar reading of excessive speed is enough to establish at least reasonable suspicion that a speeding violation occurred."); *United States v. Garcia*, 2004 WL 2537403, at *4 (W.D. Tex. Oct. 5, 2004) ("Even if they did so argue, the Court would be required to find that the stop was permissible, since it was based on an observable traffic violation."); *Robertson v. Town of Washington*, 2015 WL 1564888, at *10 (W.D. La. Apr. 6, 2015) ("The uncontroverted evidence demonstrates that Arceneaux used a police doppler radar device which clocked the vehicle drive by Dana Robertson on Interstate 49 at 81 mph in a 75 mph speed zone. Therefore, there was not only reasonable suspicion, but probable cause for him to stop the vehicle for speeding.").

Here, Defendant Hand asserts that he was operating a mobile radar unit when he observed a vehicle traveling 70 mph in a 40-mph zone, (Dkt. #31, Exhibit B). By observing a vehicle speeding, Defendant Hand had reasonable suspicion to then conduct the traffic stop. *See United States v. Castanon*, 229 F. App'x 312, 313 (5th Cir. 2007) ("By driving above the speed limit, Castanon's conduct constituted prima facie evidence of a traffic violation."). Gray offers nothing to suggest that he was not speeding. *See Richards v. Cannon*, 2016 WL 11473564, at *7 (E.D. Tex. Feb. 11, 2016) ("Although Plaintiff's challenge the lawfulness of the initial stop for speeding, they have not presented any evidence indicating that Trooper Cannon's radar was unreliable or that Trooper Cannon's offense report was untruthful.").

Because Gray offers nothing to refute that he was speeding, he has not met his burden to defeat Defendant Hand's properly supported motion demonstrating that he was traveling at a high rate of speed, thereby justifying the initial traffic stop. *See e.g., Burleson*, 393 F.3d at 589-90.

Reasonable suspicion existed to conduct a stop on Gray's vehicle because he was speeding; as a result, this claim should be dismissed.

### 2. Search of Gray's Vehicle

Gray further insists that Defendant Hand's search of his vehicle was unconstitutional. Specifically, he contends that Hand wanted to search his car because he merely "looked suspicious." Gray insists that Hand had no consent to search his vehicle but, instead, was "racial profiling"; he also complains that they were looking for drugs and guns, but nothing was found. Gray asserts that he never told Hand that he had been drinking and that he had "2 beers and went to sleep," (Dkt. #36, pg. 7).

After determining a stop as justified, as was here, the next question becomes whether "the officer's subsequent actions were reasonably related in scope to the circumstances that cause him to stop the vehicle in the first place." *See United States v. Smith*, 952 F.3d 642, 647 (5th Cir. 2020) (quoting *United States v. Pack*, 612 F.3d 341, 347, *modified on denial of reh'g*, 622 F.3d 383 (5th Cir. 2010)). Police officers may conduct a warrantless search of a vehicle if they have probable cause to believe that the vehicle contains contraband or other evidence of a crime. *See United States v. Ross*, 456 U.S. 798 (1981); *see also United States v. Clayton*, 98 F.4th 256, 263 (5th Cir. 2024) ("Pursuant to the automobile exception to the Fourth Amendment, a warrantless search of a readily mobile vehicle is permitted when law enforcement has probable cause to believe the vehicle contains contraband or evidence of a crime."); *United States v. Phillips*, 2024 WL 323498, at *3 (5th Cir. 2024) (explaining that the Fourth Amendment permits police "to search a vehicle if they have probable cause to do so.").

Probable cause determinations are made on the totality of circumstances, and "a police officer may draw inferences based on his own experience in deciding whether probable cause

exists, including inferences that might well elude an untrained person." *See United States v. Banuelos-Romero*, 597 F.3d 763, 767 (5th Cir. 2010); *see also Terwilliger v. Reyna*, 4 F.4th 270, 282 (5th Cir. 2021) ("[C]ourts must look to the totality of the circumstances and decide whether these historical facts, viewed from the standpoint of an objectively reasonable police officer[,] demonstrate a probability or substantial chance of a criminal activity.") (internal citations and quotations omitted). Moreover, consent or probable cause may independently support a warrantless search of a vehicle. *See United States v. Sutton*, 850 F.2d 1083, 1085 (5th Cir. 1988) ("If either ground existed prior to the search, the search was valid and proof of the other ground is not required."). Stated differently, if a police officer receives consent to search or probable cause exists to search, the officer may do so.

Here, Defendant Hand's bodycam video of Gray's search and ultimate arrest demonstrates that Hand had both Gray's consent and probable cause to believe Gray was driving while intoxicated. The video evidence blatantly contradicts Gray's allegations. First, as an initial matter, the video depicts Gray several times repeating himself that Defendant Hand had consent to search the vehicle, at one point specifically telling Hand to "tear up" his vehicle. Gray continued to articulate—unprompted—that he had nothing to hide and nothing inside the vehicle. Contrary to Gray's contentions, he consented to Hand's search of his vehicle. *See United States v. Khanalizadeh*, 493 F.3d 479, 484 (5th Cir. 2007) (lack of physical restraint of the defendant, failure to brandish weapons, and lack of deception points to voluntary consent to search); *see also Sutton*, 850 F.at 1085. Gray's voluntary consent provides an independent, constitutional basis to search his vehicle.

Even if Gray did not voluntarily consent, which the Court determines he did, probable cause existed to search his vehicle. As mentioned, probable cause exists "when the totality of the

facts and circumstances within a police officer's knowledge at the moment of arrest are sufficient for a reasonable person to conclude that the suspect had committed or was committing an offense." *Resendiz v. Miller*, 203 F.3d 902, 903 (5th Cir. 2002); *see also Hogan v. Cunningham*, 722 F.3d 725, 731 (5th Cir. 2013) ("Probable cause for an arrest made without a warrant exists when the totality of facts and circumstances within an officer's knowledge at the moment of arrest are sufficient for a reasonable person to conclude that the suspect had committed an offense.") (internal citations omitted).

This standard under the Fourth Amendment requires substantially less evidence than that which would be sufficient to support a conviction. *Id.* Indeed, probable cause does not require an actual showing of criminal activity. *See, e.g.*, *Ill. v. Gates*, 462 U.S. 213, 245 (1983) ("But, as discussed previously, supra, 2332, probable cause does not demand the certainty we associate with formal trials."). Probable cause, instead, requires only a "fair probability" that an offense was committed—or is being committed. *Garcia*, 179 F.3d at 269. The "fair probability" standard requires more than bare suspicion, "but it need not reach the fifty percent mark." *Id*. Accordingly, here, Gray must show that law enforcement did not possess probable cause to search his vehicle and arrest him after making the initial stop.

Here, the bodycam video shows that Defendant Hand had probable cause to search Gray's vehicle and ultimately arrest him. Upon making contact with Gray at the driver's side of the vehicle, Defendant Hand—after already observing Gray speeding—observed him (1) appearing and articulating that he was nervous, (2) struggling to retrieve his license and insurance, (3) articulating "oh goodness" several times. The Court notes that speeding can indicate that the driver is impaired, which is a factor to consider when analyzing the totality of the circumstances. *See, e.g.*, *Arthur v. State*, 216 S.W. 3d 50, 55 (Tex. App.—Fort Worth, 2007, no pet.).

Given Gray's behavior inside the vehicle, Hand requested that he exit the vehicle so that he could write him a warning. To the extent Gray complains that he was asked to exit the vehicle because he "looked nervous," the Court notes that "nervousness," alone does not support a finding of reasonable suspicion or probable cause. *See, e.g.*, *United States v. Monsivais*, 848 F.3d 353, 359 (5th Cir. 2017) (explaining that "nervousness, alone," is not sufficient to create reasonable suspicion of criminal activity); *see also United States v. Macias*, 658 F.3d 509, 520 (5th Cir. 2011) ("Nervousness, standing alone, generally is not sufficient to support reasonable suspicion.").

However, while nervous behavior alone is insufficient, nervous behavior is one factor to consider when analyzing the totality of circumstances. *See United States v. Stilley*, 91 F. App'x 284, 285 (5th Cir. 2006); *United States v. Dortch*, 199 F.3d 193, 199 (5th Cir. 1999). Here, Gray stated he was nervous and struggled to retrieve his license and insurance information when asked to do so several times. Hand's request for Gray to exit the vehicle given his behavior—after already observing him speeding—because of his nervous behavior is not constitutionally unsound.

Defendant Hand states that as Gray exists the vehicle, he "was having difficulty with balance as he walked toward the rear end of the vehicle," and that his eyes were "red." But the video does not show Gray walking, as Hand's paperwork blocks the camera. Instead, the video depicts Gray advising Hand that he has nothing inside the vehicle several times and groaning as he sits on the front of the police car.

Additionally, the video shows that Hand begins questioning Gray about where he was coming from, where he was going, who he was visiting, etc.—specifically noting that he was attempting to calm Gray down because he was still acting nervous. Gray tells Hand that he is nervous, in part, because he was on parole for a previous DWI, and that he has "nothing to hide."

Hand notes that Gray's "story is all over the place," as they are talking. Gray then consents to the search, imploring Hand to "tear it up."

Gray's answers to Hand's questioning—admitting to being on parole for a DWI charge and his "story" being "all over the place, groaning, as well as his continued nervous—provided Hand with probable cause to search the vehicle under a totality analysis. Hand's questioning of Gray concerning his origin location, why he was there, who he was visiting, and where he was going were all inquiries within the scope of Hand's investigation. *See United States v. Brigham,* 382 F.3d 500, 507-08 (5th Cir. 2004) ("An officer may also ask about the purpose and itinerary of a driver's trip during the traffic stop. Such questions may efficiently determine whether a traffic violation has taken place, and if so, whether a citation or a warning should be issued, or an arrest made.") (internal citations and quotations omitted); *see also Smith*, 952 F.3d at 648. Moreover, given that speeding can be *indicia* of mental impairment while driving, *see Arthur*, Gray's admitting to being on parole for a DWI provided Hand probable cause to believe that Gray was driving while intoxicated. The totality of the circumstances demonstrates that Defendant Hand had probable cause to search Gray's vehicle, and this claim should therefore be dismissed.

### 3. False Arrest

Gray further contends that Defendants Hand and Graham subjected him to a false arrest. He argues that Defendants did not have probable cause to make an arrest and detained pursuant to an unlawful arrest.

The Fifth Circuit applies the same standard for claims of false imprisonment and false arrest. *Haggerty v. Tex. S. Univ.*, 391 F.3d 653, 655 (5th Cir. 2004). As it appears that the charges were dropped against Gray—he was therefore never convicted for the incidents forming the basis for these particular arrests, his claims of false arrest similarly arise under the Fourth Amendment.

*See Deville v. Mercantel*, 567 F.3d 156, 164 (5th Cir. 2009). In order to establish a false arrest under section 1983, Gray must show that the arresting officers did not have probable cause to make the arrest. *See Anokwuru v. City of Houston*, 990 F.3d 956, 963 (5th Cir. 2001); *Reed v. Mun. of Taylorsville, Miss.*, 2020 WL 3213419, at *5 (S.D. Miss. Jun. 15, 2020) ("To establish that defendants violated Reed's constitutional rights by arresting her, Reed must show that the officers lacked probable cause.").

But as previously highlighted above, there was ample probable cause to arrest Gray for driving while intoxicated. The Court recounted the facts—shown on Defendant Hand's bodycam—before Defendant Hand began searching Gray's vehicle, determining that there was both (1) reasonable suspicion to conduct a traffic stop, and (2) probable cause to then search his vehicle. The video further depicts that Gray subsequently admitted to drinking at least one beer that evening as Hand searched the vehicle. While searching, Hand discovered an open can of beer and asks Gray whether it was the only beer he drank that evening—to which Gray responded that he drank one beer that evening. Gray's admission that he drank a beer prior to driving—coupled with the discovery of an open can of beer inside the vehicle as well as his statement that he was on parole for a previous DWI conviction—was sufficient to provide Hand with probable cause to then detain him, continue searching his vehicle, and request him to perform a field sobriety examination. *See Forbes v. Harris Cnty.*, Tex., 804 F. App'x 233, 238 (5th Cir. 2020) (unpublished) (highlighting *indicia* of intoxication) (citing *Kirsh v. State*, 306 S.W.3d 738, 745 (Tex. Crim. App. 2010)).

The Court notes that probable cause exited to arrest Gray. As mentioned, Defendant Hand's bodycam video shows his attempts at completing the field sobriety tests—and Defenant Hand states that he could smell alcohol on Gray's breath, and Gray remarks that he had a heart attack

and cannot walk. Defendant Hand's smelling alcohol on Gray's breath provided Hand probable cause to believe that Gray was driving while intoxicated. *See, e.g.*, *Gibson v. Rich*, 44 F.3d 274, 277 (5th Cir. 1995) ("Given the smell of alcohol, Officer Rich's knowledge that Gibson had shared a pitcher of beer with Sandra, Gibson's belligerence, and the cumulative circumstances of the night in question, Officer Rich acted as a reasonable officer could have acted in arresting Gibson for public intoxication."). Defendant Hand permitted Gray to perform the tests, and his bodycam video shows that he determined that Gray was operating a motor vehicle and intoxicated in a public place. Because the totality of the circumstances shows that Hand had ample probable cause to arrest Gray, his claim of false arrest fails and should be dismissed.

### 4. Racial Profiling, Discrimination, and Remaining Claims

Gray insists that Defendants racially profiled him, and that the City has a "policy of racial profiling." He insists that there was no reason for the initial stop, and that Defendants "continue to stop & harass profile black" individuals, (Dkt. #36, pg. 12).

The Constitution prohibits selective enforcement of laws based on considerations such as race. See Whren v. United States, 517 U.S. 806, 813 (1996). A claim concerning the discriminatory application of law sounds in the Equal Protection Clause. Under section 1983, to state a claim of racial profiling, a plaintiff must allege and prove that he received treatment different from that received by similarly situated individuals—and that the unequal treatment stemmed from discriminatory intent. *Bowlby v. City of Aberdeen*, 681 F.3d 215, 227 (5th Cir. 2012); *see also Stout v. Vincent*, 717 F. App'x 468, 471 (5th Cir. 2018) (unpublished) (citing *Bowlby*). Importantly, a plaintiff's subjective belief that he was discriminated against—without more—is insufficient to survive a motion for summary judgment. *Id.*; *see also Raina v. Veneman*, 152 F. App'x 348, 350

(5th Cir. 2005) (A plaintiff's "subjective belief that he was discriminated against, standing alone, is not adequate evidence to survive a motion for summary judgment.").

Here, Gray provides no support—other than his subjective belief—that he was racially profiled. Simply stating that he was racially profiled or "discriminated against" does not state a claim. Likewise, Gray presents nothing to suggest that he was treated differently than similarly situated persons. Gray's subjective belief that race was a consideration in the initial stop, search, and ultimate arrest is without evidence—and his contentions omit the ample reasonable suspicion and probable cause that existed to stop and arrest him for driving while intoxicated. This claim should be dismissed.

As final matters, Gray maintains that the Defendant Hudman, Chief of Police, for the failure to train. Gray contends that Hudman failed to train his subordinates "in traffic stops and racial profiling." He also sues the Henderson Police Department. But both claims should also be dismissed. The doctrine of respondent superior does not apply to section 1983. *Williams v. Luna*, 909 F.2d 121, 123 (5th Cir. 1990); *Monell v. Dep't of Social Servs.*, 436 U.S. 658, 691 (1978). Under 42 U.S.C. § 1983, supervisory officials are not liable for a subordinate's actions on any vicarious liability theory.  In fact, the Supreme Court has held that the term "supervisory liability" is actually a misnomer since "[e]ach Government official, his or her title notwithstanding, is only liable for his or her own misconduct." *See Iqbal*, 556 U.S. at 677.  In *Iqbal*, the Supreme Court rejected an argument that government officials may be held liable because they merely had knowledge or acquiesced in their subordinate's misconduct.  *Id.*  As a result of *Iqbal*, other courts have questioned whether supervisory liability remains an option at all in section 1983 cases.  *See, e.g.*, *Dodds v. Richardson*, 614 F.3d 1185, 1194-95 (10th Cir. 2010); *Parrish v. Ball*, 594 F.3d 993, 1001 n.1 (8th Cir. 2010).

Under current Fifth Circuit jurisprudence, a supervisor may only be held liable if one of the following exists: (1) his personal involvement in the constitutional deprivation, (2) sufficient causal connection between the supervisor's wrongful conduct and the constitutional violations, or (3) the supervisory official implements a policy that itself is a repudiation of civil rights and is the moving force of the constitutional violation. *See Mesa v. Prejean*, 543 F.3d 264, 274 (5th Cir. 2008); *see also Pena v. City of Rio Grande City*, 879 F.3d 613 (5th Cir. 2018) (explaining that a plaintiff in a section 1983 case establishes supervisor liability "if (1) [the supervisor] affirmatively participates in the acts that cause the constitutional deprivation, or (2) [the supervisor] implements unconstitutional policies that result in the constitutional injury.") (internal citation omitted). Gray has not met these requirements.

Gray also fails to plead a sufficient *Monell* claim. A municipality may only be held liable for its own actions—such as its official policies, customs, or actions of its employees. *See Monell v. Dep't. of Soc. Servs. of City of New York*, 436 U.S. 658, 691 (1978). A policy or custom must be the "moving force" of the plaintiff's injury, which must be a violation of a Constitutional right. *Id*. at 694; 698. Here, Gray alleges no custom, no policy, and no facts indicating that any policy or custom acted as the "moving force" of any injury. Any *Monell* claim should be dismissed.

Finally, Gray's claims against the Henderson County Police Department fail. The Fifth Circuit has held that Texas law does not allow county or municipal police departments to be sued directly. *See Crull v. City of New Braunfels, Tex.*, 267 F. App'x 338, 341-42 (5th Cir. 2008) (unpublished) ("Therefore, the Police Department is not a separate legal entity apart from the City and the district court did not err in dismissing the claims against the Police Department."). Accordingly, any claim against the Police Department should be dismissed. *See Darby*, 939 F.2d at 313; *see also Pogorzelski v. Dallas Police Dep't*, 2020 WL 5045673 *2 (N.D. Tex. Aug. 5, 2020

("As judges of this Court have repeatedly recognized, the Dallas Police Department is not a jural entity subject to suit."); *Lane v. Athens Police Dep't.*, 2006 WL 1049966 at *3 (E.D. Tex. Mar. 24, 2006 ("While he does sue the Henderson County Jail, the jail is not a separate legal entity and cannot be sued in its own name.").

5. Qualified Immunity

Defendants invoke qualified immunity. Henderson has the burden to demonstrate that the defense of qualified immunity does not apply. *See Bryant v. Gillem*, 965 F.3d 387, 391 (5th Cir. 2020); *Cunningham v. Castloo*, 983 F.3d 185, 190-91 (5th Cir. 2022). Conclusory allegations are insufficient to overcome the defense. *Williams-Boldware v. Denton Cnty., Tex.*, 741 F.3d 635, 643-44 (5th Cir. 2014); *see also Edmiston v. Borrego*, 75 F.4th 551, 561 (5th Cir. 2023) (rejecting Plaintiffs' conclusory statement).

To demonstrate the inapplicability of the qualified immunity defense, the plaintiff must satisfy a two-prong test. *Saucier v. Katz*, 533 U.S. 194, 200 (2001). The first prong is whether "the challenged conduct, viewed in the light most favorable to the plaintiff, would actually amount to a violation of [constitutional or] federal law." *Wernecke v. Garcia*, 591 F.3d 386, 392 (5th Cir. 2009) (citation omitted). The second is "whether the defendant's actions violated clearly established statutory or constitutional rights of which a reasonable person would have known." *Flores v. City of Palacios*, 381 F.3d 391, 395 (5th Cir. 2004) (citations omitted). A court may consider the two-pronged inquiry in any order. *Pearson v. Callahan*, 555 U.S. 223, 236 (2009).

Here, Gray has not identified a constitutional violation. The initial stop, search, and arrest are all constitutionally sound under the Fourth Amendment—as there was both reasonable suspicion and probable case. Defendant Hand's bodycam video contradicts Gray's version of the facts. Moreover, Gray's generalized, conclusory assertions of racial profiling are insufficient. The

Court notes that while Gray was not convicted of any offense stemming from this traffic stop and arrest, the Constitution does not guarantee that only the "guilty" will be arrested. *See, e.g.*, *Sanchez v. Swyden*, 139 F.3d 464, 468 (5th Cir. 1998) (explaining that the Constitution does not provide a cause of action for every defendant acquitted or every suspect released). Defendants are entitled to qualified immunity in this case.

<u>RECOMMENDATION</u>

Accordingly, it is recommended that Defendants' motion for summary judgment, (Dkt. #31), be granted and that this case be dismissed with prejudice.

Within fourteen (14) days after receipt of the Magistrate Judge's Report, any party may serve and file written objections to the findings and recommendations contained in the Report.

A party's failure to file written objections to the findings, conclusions and recommendations contained in this Report within fourteen days after being served with a copy shall bar that party from *de novo* review by the district judge of those findings, conclusions and recommendations and, except on grounds of plain error, from appellate review of unobjected-to factual findings and legal conclusions accepted and adopted by the district court. *Douglass v. United Servs. Auto. Ass'n*, 79 F.3d 1415, 1430 (5th Cir. 1996) (*en banc*).

So ORDERED and SIGNED this 28th day of May, 2024.

_____
K. NICOLE MITCHELL
UNITED STATES MAGISTRATE JUDGE